## Case No. 10,404.
### The OCEAN BRIDE.
[1 Hask. 331.] 2

District Court, D. Maine.  1871.

SHIPPING — FISHERY LICENSE — IMPORTATION OF FOREIGN MERCHANDISE—HOW SHOWN—FORFEITURE—SINGLE ACT OF TRADING.

1. A vessel licensed for the fisheries, that brings merchandise from a foreign port with the knowledge or consent of her officers, is engaged in other trade, and is liable to forfeiture under section 32 of the act of February 18, 1793.

2. When the importation is admitted or proved, the burden rests with the claimants to establish their innocence.

3. The illegal employment may be shown from circumstances, even against the direct testimony of the master and crew.

4. Goods of less value than $500 found on board will work a forfeiture of the vessel, notwithstanding section 21.

5. A single act of trading. not authorized by the license, will work the forfeiture. even though the business of the license is still continued.

In admiralty.   Libel in rem by the United States, claiming a forfeiture of the schooner Ocean Bride for a violation of the revenue laws, by being engaged in a trade other than that for which she was licensed. The owners, one of whom was the master, made claim and answer, denying all knowledge of the illegal traffic charged.

Nathan Webb, Dist. Atty., for the United States.

William L. Putnam, for claimants.

FOX, District Judge.   This schooner belongs to Gloucester, Mass., and was licensed in January, 1870, for the fisheries for one year, three-fourths of her being owned by John McLoud and the residue by his sons, Jesse and Alex., Jesse acting as the skipper and Alex. as one of the crew.   She was seized in September by the collector of Portland for being employed in a trade other than that for which she was licensed.

She sailed from Gloucester in August with a crew of ten men.   She cruised along the coast of Maine without great success in fishing, and about the 1st of September put into Yarmouth in the province of Nova Scotia. about 3 p. m., and sailed early the next morning.   She then proceeded westwardly, on the evening of the 3d of September off Isle Haut, was run into by another vessel, carrying away her bowsprit, &c., and she was obliged to make this port for repairs. She arrived the 4th. was overhauled by the revenue officers on the 7th, and after a pretty diligent search there was found carefully stowed away in her run twenty cases of brandy and one case of gin.   The skipper. on being informed by the officers that they suspected his vessel, stated that there were no dutiable articles on board, as they had not been into any port on the voyage where they could be obtained.   He was present when the forecastle and house were examined; offered to open the barrels of salt to satisfy the officers that they did not contain any smuggled goods.   He accompanied the officers into the after-cabin, was present with them a part of the time, but left before the discovery of the liquors, having, as is stated, been called to go to the blacksmith's for some bolts which were needed for the repairs.

The run is in the stern of the vessel directly aft of the cabin, without access, excepting through an opening in the bulkhead back of the movable stairs from the deck to the cabin, the floor of the cabin being about four feet below the deck, the stairs projecting into the cabin.   The opening in the partition separating the cabin from the run was

1 [Reported by Hon. Richard H. Dana, Jr., and here reprinted by permission.]
2 [Reported by Thomas Hawes Haskell, Esq., and here reprinted by permission.]

closed by a piece of sail-cloth, the edges of which were under the run, and it was in part kept in its place by the boxes under the floor of the run being nearly even with that of the cabin. The master, his brothers and three of the crew slept in the cabin. The whole run was filled with the cases of liquor which were stowed so as to resist the force of the waves. The case which was next to the opening was gin. Its cover was split, one bottle was missing from it, and a similar bottle, empty, was found at the time in one of the lockers in the cabin. The report of the revenue officers also showed that one or more of the cases of brandy were short of their complement of bottles, which were of a very peculiar size and form, and marked "imperial." One similar to them was also found in the locker.

After the skipper was informed of the finding of the liquors on board the schooner, he denied all knowledge of their being there, could give no information in relation to them, excepting that he supposed that they must have been put on board at Yarmouth by some one unknown to him, and without his knowledge or authority.

The liquors were advertised by the collector and no one appearing to claim them have been sold at public auction.

The answer is sworn to by the claimants and in it they severally deny all knowledge of the liquors having been placed on board of the schooner, and they have been examined as witnesses at the hearing, and each of them in the most direct and positive language re-affirms his denial and asserts that the cases were there without his consent, authority or knowledge, and that he had no suspicion that any were on board until they were so informed by the revenue officers.

If these statements of the claimants are credited by the court, the defence is sustained, as I do not hold that a vessel would be subject to confiscation when goods have been put on board of her secretly without the knowledge of her officers. Those in authority should consent to or connive at the employment in order to subject the vessel to forfeiture.

"The story now told is indeed a very extraordinary one, and yet is supported by positive, direct testimony. It is certainly the duty of the court not lightly to suspect the truth of the statements clothed with the solemn sanctions of an oath and supported by numerous concurring witnesses. But testimony however positive must in its nature be liable to control by strong presumptive circumstances, and must be weighed with care when it comes loaded with the temptations of private interests and the impressions of personal penalties. It is a melancholy consideration for the court, that in the discharge of public duty it finds itself often obliged to resist the influence of human declarations and to rely upon the concurrence of probable circumstances." These

remarks of Judge Story in The Short Staple [Case No. 12,813], may with much propriety, be adopted by the court in the present cause, although on the appeal to the supreme court, a majority of that court were of opinion that the circumstances in the case of The Short Staple were satisfactorily explained and the decree of condemnation was reversed.

Is it to be credited by the court that this vessel could have gone into Yarmouth, received on board twenty cases of liquor stowed away in the run abaft of the cabin in which the skipper and Alex. McLoud lodged with a small piece of canvas covering up the opening, and that they could have remained there from Thursday until the next Wednesday without either of these persons knowing or suspecting their being there?

The testimony is that the crew went ashore about 5 and remained until about 10, leaving only Simeon McLoud, aged 16, in charge. There is some discrepancy about the manner in which the crew went ashore, Jesse and Alex. McLoud testifying that they took both dories, five men in one and six in the other, whilst Simeon, who was not present at their examination, being examined at a subsequent day, says that all went in the first dory excepting the cook, who had something to do and did not go until half an hour afterwards. Simeon swears that he slept in the cabin, turned in about dusk, that before that no one had come off. That he soon fell asleep and did not wake until morning. Did not know when any of the crew came on board, heard no noise and knew nothing of any one having come on board or of any boxes being put on board that night. First he knew about them was when they were found by the revenue officers. This statement I cannot credit. The cases must have been taken into the little cabin where he slept, as he says, from there passed into the run, which was a dark place, and required a light of some kind, as is evident from the manner in which the boxes were stowed. It must have taken more than one man to accomplish it, and after it was done would have immediately been discovered by a boy of that age, always on the lookout and peering into every out of the way place in such a craft, especially when his attention would be attracted by the canvas used as a covering for the opening into the run.

Under the circumstances of guilt which surround this vessel, if these cases had been procured and put on board of her at Yarmouth by some of her crew, I hold it was incumbent on the claimants to establish this by the independent testimony of the crew, especially of those who were not concerned in the affair, and also by the evidence of the parties at Yarmouth, from whom these liquors were procured. This latter testimony could have been obtained by a commission, but the claimants have not endeavored to procure it, or that of any others of the crew excepting three brothers as before stated.

The excuse now given for going into Yarmouth is that the weather was foggy, and they thought it prudent to make a harbor on that account. It does not appear from the testimony that any other vessel thought such a precaution expedient, as there were none that night in at Yarmouth excepting the cutter. From all the circumstances the court is the rather impressed with the belief that they made this port to procure these articles, rather than on account of the bad weather, especially when it is recollected that the next morning they turned their course homeward, not doing much certainly in fishing, as the next night they were off Isle Haut, more than one hundred miles from Yarmouth.

It is stated that one or more of the crew belonged in the vicinity of Yarmouth, and it is urged in argument that whilst the officers were on shore, these cases of liquor were surreptitiously put on board by some of the crew without the authority or connivance of the officers; but of all the attempts at smuggling which the court has been called upon to investigate, this is the most improbable, and is certainly as bold an operation on the part of a crew, without a shadow of a possibility of escaping discovery, as can well be imagined.

There are other facts and circumstances which directly establish the complicity of the officers in this transaction. They occupied the cabin, and in the lockers there were found bottles corresponding with those which were missing from the packages, peculiar in their appearance, and one of which was of a kind before unknown to the officers. These bottles were empty, and no doubt can be entertained that the contents were consumed in the cabin on the trip, and yet these claimants deny all knowledge on their part of these being on board.

Again, when the skipper was informed by the officers that they suspected he had smuggled goods on board, he denied it, asserting that they had not been to any place where they could have procured them if they wanted to do so. This statement is proved against the skipper by two witnesses and is not really denied by him. That the statement is false is now admitted. Why resort to falsehood to conceal their voyage, if all that had taken place was honest and legal? Parties do not state that which they know is absolutely false without motive and object, and in the present instance the purpose is quite apparent. If true, of course there could not be on board of the vessel any goods thus illegally imported from a foreign place, and therefore there could be no further occasion for examination; if the vessel had merely touched at Yarmouth for a harbor one night, sailing the next morning without any merchandise being brought on board, why did not the master so state frankly and according to the truth, and let the officers then act for themselves in searching her or not as they should think best? If, on the contrary, the skipper was conscious of his guilt, was well aware that a search would disclose their illegal conduct by discovering its fruits, what more natural than for him to attempt to avert all suspicion by his repudiating and denying his having had the opportunity thus to acquire the merchandise. If he had not been conscious of guilt, if he did not know that a search would disclose his misconduct, would he have attempted by a falsehood to blind the eyes of the inquirers? If he knew he was innocent, would he not have instantly disclosed all he knew, asserted that the fullest investigation would disclose nothing to implicate him or his vessel?

There are other circumstances which tend to confirm the conclusion that the skipper was aware the liquor was concealed on board the schooner, especially his leaving the cabin just before the liquors were discovered, and when it was apparent from their thorough search that it would soon be found. An explanation is attempted, viz.: that he was called upon by Alex. to go to the blacksmith's for some bolts; in this he is not corroborated by Simeon, and I have great doubt of the truth of this excuse; but even if it were so and he had been thus called away, if he had been conscious of his innocence and that nothing could be discovered, I apprehend he would certainly have remained until the search was ended, and not have allowed the officers to pursue their search in the cabin with none of the officers to observe their proceedings. Statements made by him to the officers were not such as an innocent party would be likely to make, and notwithstanding the positive denials of the skipper and his brothers, I am forced to the conclusion and have no doubt, that the schooner was designedly taken to Yarmouth for the purpose of obtaining these liquors, and that at the time of the collision she was making her way homeward as direct as possible, with the intent on the part of those in charge to smuggle the liquors into the country, if practicable.

The thirty-second section of the act of February 18, 1793 [1 Stat. 316], declares that "if any licensed ship or vessel shall be employed in any other trade than that for which she is licensed, every such ship or vessel with her tackle, &c., and the cargo found on board of her shall be forfeited."

In the various cases which have been before the district and circuit courts for a violation of this provision, it has been uniformly held that a single act of trading not authorized by a license would subject the vessel to forfeiture. It is claimed in defence, that the trade or employment for which the vessel is licensed must be abandoned, and that for the time being she must be exclusively employed in the unauthorized trade, in order to subject her to forfeiture. Such a construction does not meet with the approval of the court. If adopted it would eventually annul and defeat this provision of the act. If it is sanctioned, a vessel licensed for the fisheries

might pursue in part that employment, and as occasion offered in the course of her fishing voyages engage in smuggling operations, and thus the mischief would prosper which the law intended to punish. A vessel in the course of her voyage may pursue two employments, one legal, the other unauthorized, and be subject to the penalties of the law for the consequences of her illegal employment. This was in fact decided in the cases of The Nymph [Case No. 10,388]; The Harriet [Id. 6,099], and other fishing vessels, condemned heretofore in this district for pursuing the mackerel fisheries when licensed for cod-fishing, and no doubt exists as to the correctness of the construction given to this section by the rulings in these cases.

It is further contended, that as the goods found on board the schooner were not of the value of $500, that the vessel should not be condemned, because by the twenty-first section of the same act, which authorizes permits for fishing vessels to touch and trade at a foreign port, it is enacted "that if any such licensed vessel is found within three leagues of the coast, with merchandise of foreign growth on board exceeding the value of $500 without having such permission on board, such ship or vessel shall be subject to forfeiture;" and from this it is argued that it was not the intention of congress to subject a licensed fishing vessel to forfeiture for trading without a permit, unless she is found within three leagues of the coast with foreign goods exceeding the value of $500. The twenty-first section was intended to secure the revenue, and to subject to forfeiture vessels licensed for the fisheries found near the coast with the prohibited quantity of foreign merchandise. Such a vessel is presumed to be engaged in a smuggling enterprise, without regard to the manner in which she has obtained such merchandise, being licensed only for the fisheries, without authority to visit foreign ports. She would not be so likely to fall under the suspicion of the officers of the revenue, and would enjoy greater freedom and license in smuggling.

The thirty-second section of the act, as decided in the case of The Active, 7 Cranch [11 U. S.] 100, was intended as a regulation of commerce and navigation, to restrict each vessel to her legitimate employment, and was not entirely designed to protect the revenue. In that case it was stated, "Although other sections of the act furnish much reason for believing that a forfeiture in a case where the revenue could not be defrauded might not be contemplated by the legislature, yet they are not expressed so as to control the thirty-second section." In the case of The Three Brothers [Case No. 14,009], it appeared that

the vessel was licensed for the fisheries and in the course of the voyage she caught over 500 quintals of fish; she also procured by purchase, at a port in Labrador, fifty quintals of fish, eight barrels of mackerel and eight of salmon, all being of less value than $400. Mr. Justice Story said: "Upon principle as well as upon authority of the case of The Active, I am satisfied that the purchase and taking on board of the fish was a trading within the thirty-second section, but, as there is no count founded on that section, the forfeiture cannot in this suit be adjudged." The learned judge in the same opinion says, "Perhaps it is not easy to reconcile all the provisions of the act together; but it seems to me that the eighth section points to a foreign voyage where there is no intent to pursue the fisheries; the twenty-first section to voyages where the vessel is engaged in the fisheries, and afterwards proceeds and trades with her cargo at a foreign port; and the thirty-second section with a sweeping effect to all manner of trading beyond the authority of the license. In some cases these sections may be cumulative and perhaps cannot otherwise be completely reconciled." The words of the thirty-second section are clear, explicit, absolute, and no limitation is to be found in any part of the entire act by which a vessel is saved from forfeiture, if found employed beyond the authority of her license.

In The Short Staple [Case No. 12,813], Judge Story says, when the onus probandi rests on the claimants, a forfeiture must be pronounced unless he brings the defence clear of any reasonable doubt; and this rule received the sanction of the supreme court of the United States in the case of The Octavia, 1 Wheat. [14 U. S.] 20. In Cliquot's Champagne, 3 Wall. [70 U. S.] 114, it was decided that when probable cause of forfeiture is made out, the onus of proving innocence is thrown upon the claimant in all cases, and has always been regarded as a permanent feature of the revenue system of the country.

It being admitted that the vessel had visited a foreign port and there received on board this amount of foreign merchandise and brought the same to this place, the burden was clearly upon the claimants to establish their innocence. Instead of verifying it, the examination has satisfied me that they were knowingly and purposely engaged in an attempt to defraud the revenue by illegally importing in this vessel foreign merchandise.

I pronounce therefore the condemnation of this vessel, her tackle, apparel and furniture, with the cargo on board at the time of seizure, as forfeited, together with costs to the United States against the claimants and their sureties.